G.D. etc., et al., Plaintiffs, Appellants,

v.

**WESTMORELAND SCHOOL
DISTRICT, Defendant,
Appellee.**

No. 90–2123.

United States Court of Appeals,
First Circuit.

Heard March 5, 1991.

Decided April 12, 1991.

Louis W. Helmuth with whom Van Buiten, Helmuth, Lode & Rees, were on brief, Burlington, Vt., for plaintiffs, appellants.

Cynthia Andras Satter with whom Arnold H. Huftalen and Devine, Millimet & Branch, were on brief, Manchester, N.H., for defendant, appellee.

Before CYR, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

This appeal arises from the district court's grant of summary judgment to defendant Westmoreland (New Hampshire) School District ("Westmoreland"). The district court upheld the finding of a New Hampshire Department of Education hearing officer that G.D., an educationally handicapped child living within the school district, had received an appropriate Individual Education Plan ("IEP") for the 1988–89 school year and that the IEP, which recommended that G.D. continue his education in the Westmoreland public schools, constituted a free appropriate public education ("FAPE"). We affirm summary judgment for Westmoreland, upholding both the district court and the administrative finding.

## I. BACKGROUND

This action arose under the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400, *et seq.* (1988), with jurisdiction grounded in 20 U.S.C. § 1415(e)(2) and

§ 1415(e)(4)(A).[1] The appellants, W.D. and E.D., parents of G.D., a minor, assert that the district court's upholding of the administrative finding, which accepts Westmoreland's IEP for G.D., contravenes both procedural and substantive requirements of the EHA. While the parties agree that no genuine issues of material fact exist, W.D. and E.D. claim errors of law in the court's application of statutory requirements under the EHA.

G.D., now thirteen years of age, was first coded as an educationally handicapped child under both New Hampshire and federal statutes[2] in 1985 during the fall of his second grade year. Enrolled at the Westmoreland Elementary School from kindergarten through the fourth grade, 1983–1988, G.D. is now a student at the Carroll School, a private school for learning disabled children in Lincoln, Massachusetts, where he was unilaterally placed by his parents in September of 1988.

As a result of G.D.'s being diagnosed as learning disabled in 1985, a local education placement team ("LEPT"), with G.D.'s mother E.D. as a permanent member, was formed to develop an IEP for G.D. This team, composed also of G.D.'s classroom teacher, his resource room teacher and various administrators within the Westmoreland system, formulated an annual IEP. G.D.'s 1985–86 IEP, for example, provided for regular classroom instruction supplemented by seven and one-half hours weekly in a resource room working on language skills in a small group or singly with a resource teacher. This second-grade IEP was examined and accepted by G.D.'s parents, as was a similar IEP for 1986–87. See 20 U.S.C. § 1415(b)(1)(A) (providing "an opportunity for the parents or guardian of a handicapped child to examine all relevant records with respect to the identification, evaluation, and educational placement of the child"); 34 C.F.R. § 300.500 (defining parental consent and its function in approving an IEP).[3] G.D.'s parents did not, however, accept the 1987–88 IEP and sought independent evaluations of their child to document their concerns with his ongoing program at Westmoreland.

Between May of 1987 and April of 1988, G.D. was examined and evaluated by three different learning specialists. David M. Ranks, Ph.D., a clinical psychologist, concluded that G.D. possessed a dyslexic, neurologically based disorder that should be remedied by a language-based learning program. Robert L. Kemper, Ph.D., a speech-

1. 20 U.S.C. § 1415(e)(2) provides in pertinent part:

> Any party aggrieved by the findings and decision made ... shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

20 U.S.C. § 1415(e)(4)(A) states: "The district courts of the United States shall have jurisdiction of actions brought under this subsection without regard to the amount in controversy."

2. 20 U.S.C. § 1401(a)(1) provides in pertinent part:

> The term "handicapped children" means mentally retarded, hard of hearing, deaf, speech or language impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services.

New Hampshire's statute generally tracks the federal statute. RSA 186–C:2 (1981) defines "educationally handicapped child" as any person 3 years of age or older but less than 21 years of age who has been identified and evaluated by a school district according to the provisions of RSA 186–C:7 and determined to be mentally retarded, hearing impaired, speech or language impaired or both ... or as having specific learning disabilities, who because of such impairment, needs special education or special education and educationally related services.

3. 34 C.F.R. § 300.500 provides in pertinent part:

> As used in this part: Consent means that:
> (a) The parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or other mode of communication;
> (b) The parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought, and the consent describes that activity and lists the records (if any) which will be released and to whom; and
> (c) The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at any time.

language pathologist, predicted increasing learning problems for G.D. as the child faced increasingly complex linguistic demands; he also recommended a self-contained language-based classroom with integration across the curriculum. While both of these assessments were considered by the LEPT and some aspects were incorporated into G.D.'s IEP, neither G.D.'s basic program nor placement was effectively altered.

Thomas R. Shear, Ed.D., a special education consultant, was asked by the school district to perform a cognitive assessment of G.D. He indicated that G.D.'s high verbal intelligence was compromised by his language processing and production difficulties. In testimony before the administrative hearing officer, Dr. Shear, unlike the other two evaluators, endorsed the Westmoreland IEP and placement.

G.D.'s LEPT met on May 12, June 2, and August 31, 1988, to discuss and draft G.D.'s proposed IEP for the 1988–89 school year. All team members including E.D. and, on June 2, Westmoreland's attorney, were present. At the August meeting, E.D. rejected the proposed IEP and asked for a discussion of placement; namely, a change of her son's placement to the Carroll School. It was agreed that placement would be discussed at the next LEPT meeting on September 13, 1988. On that date when G.D.'s placement at Westmoreland was fixed, the D.s had already unilaterally placed their son at the Carroll School. On September 21, 22, 23, and November 15, 1988, a due process hearing was held by the New Hampshire Department of Education pursuant to 20 U.S.C. § 1415(b)(2).[4] The hearing officer evaluated the testimony of thirteen witnesses, including three experts, and examined 139 exhibits submitted by the plaintiffs and fifty-one submitted by the school district. He made 149 findings of fact and twenty rulings of law. His decision of February 1989 supported the Westmoreland IEP and placement as

providing a free appropriate public education for G.D. *See Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 189, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982) (holding that the EHA's requirement of a "free appropriate public education" is satisfied if, *inter alia,* "personalized instruction is being provided with sufficient supportive services to permit the [handicapped] child to benefit from the instruction").

After the D.s appealed to the district court, both parties moved for summary judgment under Rule 56, Fed.R.Civ.P. The district court granted summary judgment to the Westmoreland School District. The D.s now claim errors of law and ask for reversal of judgment and a remand solely for the purpose of determining whether they are entitled to attorney's fees.

## II.  STANDARDS OF REVIEW

### A.  *District Court's Review of Administrative Proceedings*

■ The review criteria under the EHA are contained in 20 U.S.C. § 1415(e)(2). In assessing the appellants' complaint, the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the *preponderance of the evidence,* shall grant such relief as the court determines is appropriate." *Id.* (emphasis added). Hence, the administrative record shall be given "due weight" by the district court. Its review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities." *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051.

Following *Rowley,* we, as well as other circuits, have consistently held that the trial court's review "is to be something short of a complete *de novo* review of the state educational program." *Colin K. by John K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983).

---

**4.** 20 U.S.C. § 1415(b)(2) provides in pertinent part:

· Whenever a complaint has been received ..., the parents or guardian shall have an opportunity for an impartial due process

hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency.

*See also Christopher W. v. Portsmouth School Comm.,* 877 F.2d 1089, 1094 (1st Cir.1989); *Lachman v. Illinois State Bd. of Educ.,* 852 ·F.2d 290, 297 (7th Cir.1988) ("in reviewing the decision of the court below, we, like the district court, must take great care to avoid displacing the educational policy judgments made by appellees," i.e., state and local public education officials); *David D. v. Dartmouth School Comm.,* 775 F.2d 411, 424 (1st Cir.1985) (to be preserved for judicial review, issues must first be presented to the administrative hearing officer), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986); *Bertolucci v. San Carlos Elementary School Dist.,* 721 F.Supp. 1150, 1153–54 (N.D.Cal.1989) (scope of judicial review limited to whether provisions for child are sufficient to attain passing grades and grade promotions); *Manuel R. v. Ambach,* 635 F.Supp. 791, 794 (E.D.N.Y.1986) (reviewing court not to decide which program offers greatest benefits, but whether program offered to child enables him "to receive educational benefits"). While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately "left to the discretion of the trial court." *Town of Burlington v. Department of Educ., Comm. of Mass.,* 736 F.2d 773, 792 (1st Cir.1984), *aff'd* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) [hereinafter *Burlington II* ].

In cases challenging a school district's FAPE, two questions must be posited in the trial court's limited review:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

*Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3051.

The district court in this case answered "Yes" to both of these questions.

**B. *Summary Judgment***

We agree with both parties and the district court that there are no remaining issues of material fact. Summary judgment is proper if there is no "genuine issue of material fact" in the pleadings or in matters "outside" the pleadings such as "depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any...." Fed.R.Civ.P. 56(c). *See, e.g., Caputo v. Boston Edison Co.,* 924 F.2d 11, 13 (1st Cir.1991).

**C. *Errors of Law***

■ The issue on appeal, therefore, is simply whether the district court committed errors of law in applying the state and federal statutes mandating education for handicapped children. "The standard of review for questions of law decided by a district court is *de novo* scrutiny, as the conclusions of law of a trial court are not binding on the reviewing court." *New England Legal Foundation v. Massachusetts Port Auth.,* 883 F.2d 157, 167 (1st Cir.1990) (citing *United States v. Yoffe,* 775 F.2d 447, 451 (1st Cir.1985)). *See also Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982) (citing *United States v. Singer Mfg. Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963)). Summary judgment review is also, of course, *de novo.* We begin with a brief overview of the statutes at issue.

## III. STATUTORY APPLICATION

The First Circuit has reviewed the structure and application of the statutory scheme arising under the EHA numerous times since its definitive construction in *Rowley* in 1982. *See, e.g., Christopher W. v. Portsmouth School Comm.,* 877 F.2d at 1094; *David D. v. Dartmouth School Comm.,* 775 F.2d at 414–15; *Burlington II,* 736 F.2d 773; *Doe v. Brookline School Committee,* 722 F.2d 910 (1st Cir.1983); *Colin K. v. Schmidt,* 715 F.2d 1. *See generally Rowley,* 458 U.S. 176, 102 S.Ct. 3034.

As outlined in the facts of this particular case, the EHA assists state and local agen-

cies in identifying and educating both physically and mentally disabled children. *See* n. 2, *supra.* A recent First Circuit case summarizes the statutory procedure and requirements:

> Federal funds are provided to contracting states which promise to provide at minimum a "free appropriate public education" for all handicapped children within the state, 20 U.S.C. § 1412(1), and which agree to set up a complaint and appeal process for the children and their parents as the federal Act mandates.

The key operative feature of the federal Act is the "individualized education program" (IEP). 20 U.S.C. §§ 1401(19); 1414(a)(5). The IEP process is the means through which the statutory mandate is "tailored to the unique needs of the handicapped child." *Rowley,* 458 U.S. at 181, 102 S.Ct. at 3038. The IEP itself is formulated at a meeting of the parents, teachers, administrators and, where appropriate, the child. It must specify the instructional goals and objectives, any special services to be provided, and criteria for progress evaluation. *See* § 1401(19). The Act further requires at least an annual review of each child's IEP and authorizes revisions where appropriate. § 1414(a)(5); *see also* § 1413(a)(11).

If the parents or the child believe that the IEP the school system decides to implement provides a lesser education than they regard to be their legal right, or if they feel their procedural rights have been infringed, they have a right to an impartial due process hearing conducted by the state educational agency. § 1415(b)(2). Should any party be "aggrieved by the findings and decision" of the state administrative hearing, § 1415(e)(2) of the Act grants a right to bring a civil action in federal or state court.

*David D. v. Dartmouth School Comm.,* 775 F.2d at 414–15.

### A. Procedural Rights

In the instant case, the D.s contended that G.D.'s procedural rights under the EHA were violated in the four following ways: (1) Westmoreland did not sufficiently consider Dr. Kemper's independent evaluation urging a language-based curriculum and self-contained classroom; (2) Westmoreland predetermined G.D.'s continuing public school placement before approving his 1988–89 IEP; (3) Westmoreland failed to consider the D.s' requested change of placement to the Carroll School; (4) Westmoreland failed to provide adequate written notice to the D.s upon its refusal to change G.D.'s placement.

■■■ We agree with the district court's endorsement of the extensive findings of the administrative hearing officer in these four areas. First, the hearing officer rejected the D.s' contention that their expert's opinion was not properly considered in G.D.'s IEP and placement. Both federal and New Hampshire standards require only that an independent educational evaluation "must be considered" in the decision made by a public agency, not that there be substantive discussion of that opinion.[5] *See* New Hampshire Standards for the Education of Handicapped Students, Ed. 1125.01(b)(4)c(1) [hereinafter N.H. Standards]. The record documents the hearing officer's finding that Dr. Kemper's report was reviewed at Westmoreland's LEPT meeting of February 15, 1988, and that it was partially incorporated into G.D.'s proposed 1988–89 IEP. Because the procedure followed met the statutory standard, the district court correctly affirmed the hearing officer on this issue.

■■■ Second, there is no evidence in the record that G.D's placement for the 1988–89 school year was determined before his IEP had been finally approved, in violation

---

**5.** 34 C.F.R. § 300.503(c)(1) states:

(c) *Parent initiated evaluations.* If the parent obtains an independent educational evaluation at private expense, the results of the evaluation:

(1) Must be considered by the public agency in any decision made with respect to the provision of a free appropriate public education to the child[.]

The New Hampshire standards parallel this language.

of 34 C.F.R. § 300.552(a)(2) and N.H. Standards, Ed. 1115.02.[6] Although the minutes of the Westmoreland LEPT meetings document that a draft IEP was available for G.D. as early as June 1988, his final IEP was not approved until the August 31, 1988, meeting. It was at this meeting that E.D., in attendance, asked the team to discuss placement, even though she did not agree with the IEP. The minutes note that, despite E.D.'s request to determine placement, "that was not planned to be discussed at this meeting. The team agreed to meet again on Tuesday, September 13, 1988, at 1:00 p.m." At the September meeting, after G.D. had been unilaterally removed from Westmoreland by his parents, the LEPT determined, as agreed, G.D.'s 1988–89 school placement. Again, we concur with the district court in its construction of the statutes and its affirmation of the administrative proceeding.

The third question is whether the district court erred in condoning Westmoreland's failure to consider a specific change of G.D.'s placement to the Carroll School. N.H. Standards, Ed. 1115.02(c) cautions that the placement decision should be made "by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." *See also* 34 C.F.R. § 300.533(a)(3). E.D., who was present at the September LEPT placement meeting, claims that the Carroll School was not discussed as an option. But New Hampshire's educational standards also spell out a "continuum of alternative education environments" for handicapped students ranging from "least to most restrictive." N.H. Standards, Ed. 1115.04. Westmoreland insists that its LEPT in September reviewed this continuum of possible educational environments, beginning, as is the federal and state statutory order, with the least restrictive.

(b) Each public agency shall insure:

(2) That special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

34 C.F.R. § 300.550(b)(2). *See generally* 20 U.S.C. § 1412(5)(B); 34 C.F.R. §§ 300.-533(a)(4), 300.550–554. Westmoreland contends and the district court found that it needed only to reach (d) on the continuum of alternatives provided by New Hampshire law—"Regular Classroom Plus Resource Room Help"—to achieve an appropriate FAPE placement in G.D.'s case. Hence, the Westmoreland LEPT did not need to discuss, or even to reach, the most restrictive educational environments— "Full–Time/Part–Time Special Day School" and "Full–Time Residential Placement." N.H. Standards, Ed. 1115.04(d), (g), (h). The Carroll School clearly fits into one of these most restrictive categories. It, therefore, remained undiscussed as a possibility.

Since *Rowley's* construction of the EHA, a FAPE has been defined as one guaranteeing a reasonable probability of educational benefits with sufficient supportive services at public expense. *Rowley*, 458 U.S. at 187–89, 102 S.Ct. at 3041–42. Following *Rowley*, courts have concluded that a FAPE may not be the *only* appropriate choice, or the choice of certain selected experts, or the child's parents' *first* choice, or even the *best* choice. Barring higher state standards for the handicapped, a FAPE is simply one which fulfills the minimum federal statutory requirements. *See, e.g., Lachman*, 852 F.2d at 297 ("Parents have no right ... to compel school district to instruct handicapped child in one specific method when district's method allows child to benefit from his education and progress toward his IEP goals."); *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1314 (9th Cir.1987) ("We must uphold the appropriateness of the District's placement if it was reasonably calculated to provide [student] with

---

**6.** N.H. Standards, Ed. 1115.02 provides in pertinent part: "The decision to place any educationally handicapped student shall occur after and pursuant to the development and approval of an Individualized Education Program."

educational benefits."); *Manuel R. v. Ambach*, 635 F.Supp. at 794 (question is one of reasonable calculation of educational benefits; it "seems irrelevant" whether "one program is better than the other."); *Bertolucci*, 721 F.Supp. at 1156 (question of "better results" at another school does not affect district's placement if latter is appropriate: "The hearing officer was correct in focusing primarily on the District's placement, rather than on the alternative that the family prefers.").

In recent First Circuit and New Hampshire cases which parallel G.D.'s situation in that reimbursement was sought from school districts for placement other than the public schools, courts have denied the more restrictive alternative in the face of an existent FAPE. In *Scituate School Comm. v. Robert B.*, 620 F.Supp. 1224 (D.C.R.I.1985), *aff'd without opinion*, 795 F.2d 77 (1st Cir.1986), for example, the court concluded that the Scituate IEP would have provided an "adequate FAPE." Therefore, the court refused to select the expert's plan for a more restrictive environment because it failed to find "a state right to FAPE qualitatively greater than the federal right." *Id.* at 1234, 1237. Similarly, the New Hampshire Supreme Court reversed a lower court's decision on reimbursement following a change of a student's placement. It held that if the school district had submitted an adequate IEP and the student's expenses at another school "were not voluntarily chosen by the school district as part of the IEP developed pursuant to RSA chapter 186–C," they were "not chargeable to the school district under RSA 169–B:40." *In re Todd P.*, 127 N.H. 792, 509 A.2d 140 (1986).

■ Fourth and finally is the procedural issue of written notice. The D.s claim that their failure to receive adequate notice of Westmoreland's refusal to change their son's placement violated 34 C.F.R. § 300.533(a) and N.H. Standards, Ed. 1115.-

02(c). This claim is not supported by the record. E.D., as a member of the Westmoreland LEPT, was present at the September 13, 1988, meeting in which G.D.'s placement was affirmed as unchanged. She also received a copy of the minutes of that meeting, as well as a copy of her parental rights at the time of the August 31, 1988, meeting. N.H. Standards, Ed. 1125.01(b)(1)a provides in pertinent part:

> Parents of an educationally handicapped student shall be notified in writing a reasonable time before the Local Education Agency proposes to initiate or change, or refuses to initiate or change, the ... placement of the educationally handicapped student....

In the D.s' case, Westmoreland's refusal to alter G.D.'s placement was never implemented because of the child's unilateral placement at the Carroll School prior to September 13, 1988. A special memo dated July 3, 1989, from the New Hampshire Department of Education confirms that notice must be given "prior to the *implementation* of the decision, *not* prior to the *making* of the decision by the Team." Special Education FY 90 Memo # 1. Moreover, meeting minutes *can* constitute written notice if these minutes contain the seven requisite content items regarding the proposed school district action.[7] "The *format* for Written Prior Notice is not standardized or regulated." (Emphasis in original.) Some "districts have modified their Team meeting minutes format to cover the required seven elements of Written Prior Notice (including notification of parental rights)." *Id.* We agree with the district court that the D.s received adequate written notice prior to a decision which was never implemented.

## B. *Substantive Rights*

■ Having established that there was procedural compliance under the federal

---

7. According to Special Education FY 90 Memo # 1:

> The *content* of a Written Prior Notice is very specific and very clear:
> 1. *What* action is being proposed;
> 2. *Why* it is being proposed;

> 3. *Other options* which were considered;
> 4. *Why* the other options were *rejected;*
> 5. The *basis* of the proposed action;
> 6. A statement of the *parent's rights;*
> 7. A description of any *other factors* relevant to the proposal. (Emphasis in original.)

and state statutes and *Rowley*, we now address the crucial substantive question: did the district court err in finding that the hearing officer correctly determined that the Westmoreland IEP and proposed placement for G.D. were "reasonably calculated to enable the child to receive educational benefits"? *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

The D.s contend on this appeal that the district court incorrectly applied the *Rowley* standard because, in fact, New Hampshire law is predicated on a higher standard. The district court has acknowledged that "[i]n its brief before the hearing officer, plaintiffs pressed the claim that the Policy and Purpose statement of the Special Education Act of New Hampshire, N.H.Rev.Stat.Ann. 186–C ... imply [sic] a higher standard." But the district court has also stated:

> However, plaintiffs have not pressed this claim in the instant case. Furthermore, this Court has found no authority which interprets the New Hampshire standards to be higher than those in the EHA. The Court therefore proceeds under the federal substantive analysis enunciated in *Rowley*.

See *G.D. v. Westmoreland School District*, Civ. No. 89–086–S, Order, 19 n. 8 (Sept. 24, 1990). Because the plaintiffs did not articulate this claim to the district court, they cannot raise the issue of the New Hampshire statutory standard on appeal.

We have consistently held in a long line of cases that issues not presented to the district court will not be preserved for appeal. Our logic is at least two-fold: an appellant cannot evade the scrutiny of the district court nor can he surprise the court on appeal with a new claim in order to create essentially a new trial. Only in " 'exceptional cases or particular circumstances' " will appellate courts have the discretion " 'to review questions of law neither pressed nor decided below.' " *United States v. Krynicki*, 689 F.2d 289, 291 (1st Cir.1982), *quoted in United States v. Serrano*, 870 F.2d 1, 17 (1st Cir.1989). In *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890 (1st Cir.1979), we observed that "[i]t is by now axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal." *Id.* at 894 (citing *Roto–Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497, 500 (1st Cir.1962); *Demelle v. Interstate Commerce Comm.*, 219 F.2d 619, 621 (1st Cir.), *cert. denied*, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955)). A recent First Circuit case agreed with the Third Circuit that a theory not raised at the trial court but only in the pleadings could not be raised on appeal. *Wallace Motor Sales v. American Motors Sales Corp.*, 780 F.2d 1049, 1067 (1st Cir.1985) (citing *In re Linda Coal and Supply Co. v. L.H. Haberman and Son*, 255 F.2d 653 (3d Cir. 1958)). Hence, the window of exception permitting new issues to be heard on appeal is very narrow in this circuit.

Although we need not reach the question of whether New Hampshire mandates a higher standard than that outlined in *Rowley*, we would uphold the district court on this point also. There is more than ample evidence in New Hampshire case law that the statutory mandate of "equal educational opportunities" for "all children in New Hampshire," RSA 186–C:1 (1981), was so stated to comply with and parallel the precise requirements of the EHA, 20 U.S.C. §§ 1400–54. The premier case on the New Hampshire standard in this circuit, *Garrity v. Gallen*, 522 F.Supp. 171 (D.N.H.1981), *aff'd*, 697 F.2d 452 (1st Cir.1983), deems this New Hampshire standard of "equal educational opportunity" as a " 'hybrid' composition," an "amalgam" of "both federal and state law." *Garrity* further says that "[t]he policy behind RSA 186–C is stated in its preamble, which tracks the language of the federal statute." *Id.* at 221. The Supreme Court of New Hampshire has repeatedly confirmed this close parallel between the federal and state statutes. *See In re Laurie B.*, 125 N.H. 784, 489 A.2d 567 (1984); *Petition of Milan School District*, 123 N.H. 227, 230–31, 459 A.2d 270, 272–73 (1983) (RSA 186–C "represents New Hampshire's efforts to ensure compliance with the federal law").

In *Burlington II*, 736 F.2d at 789 and n. 17, we concluded that Massachusetts' statutory standard both predates and exceeds

the "federal basic floor" of the EHA. This is not true of New Hampshire's statutory standard for the educationally handicapped. Further, in *Scituate School Comm.*, 620 F.Supp. at 1234, the district court rejected a claim that Rhode Island's substantive educational standard is higher than the federal standard. In doing so, it insisted that "those states which have adopted a higher standard of FAPE [than the federal standard in *Rowley*] have done so through legislation which clearly indicates such intent." (Footnote omitted.) Our scrutiny of New Hampshire statutes and case law indicates no such language, as well as no hint of precedent, linguistic or judicial, for the plaintiffs' belated contention that the New Hampshire standard exceeds the EHA.

There is no procedural or substantive basis for an appeal on this issue.

## IV. CONCLUSION

*Affirmed.* Costs awarded to appellees.